## UNITED STATES v. SANDLASS.

### No. 5524.

District Court, D. New Jersey.

July 17, 1940.

William F. Smith, Acting U. S. Atty., of Trenton, N. J., for the government.

Edwards, Smith & Dawson, of Jersey City, N. J., for defendant.

FORMAN, District Judge.

The complaint of the government alleges that the defendant at a time unknown to it erected a building approximately two hundred feet in length extending along and encroaching upon its forty foot right of way to the extent of approximately

thirty feet. A mandatory injunction is sought for the removal of the encroachment.

The defendant, William Sandlass, now deceased, denies the government's title to a forty foot right of way, and asserts that such right of way could not exceed a width of twenty-four feet, that being the practical extent at the time of the government's acquisition of title. It is also claimed that the government's right of way is presently ineffective and vitiated, because its southern end joins an abandoned roadway, title thereto having reverted to defendant. Defenses of unclean hands, laches, adverse possession in the defendant, lack of notice of the government's right of way, and the existence of an adequate remedy at law are asserted. As a counterclaim defendant alleges that the government has claimed exclusive dominion over part of its alleged right of way and unwarranted dominion over other parts, and against these acts an injunction is sought.

The right of way involved herein has its inception with a map filed with the Clerk of Monmouth County in August, 1880, by the Highland Beach Association pursuant to its plan of developing a tract of land lying between the Atlantic Ocean on the east and the Shrewsbury River on the west, being located in the Borough of Seabright, County of Monmouth, State of New Jersey. This map divides this tract of land into lots numbered from 1 to 74, inclusive, running north to south. These lots are bisected by a forty foot right of way. Abutting on the east, and parallel thereto, is a sixty foot right of way of the New Jersey Southern Railroad. The forty foot right of way is designated on the map as Ocean Avenue. On the north of this property, as delineated on the map, the United States Government owned extensive property for military purposes (Fort Hancock, etc.).

The government acquired title on July 27, 1892, to lots 2 to 22, inclusive, "Together with a right of way over the road *now laid out* on lots Twenty-three (23), Twenty-four (24), Twenty-five (25), Twenty six (26), Twenty-seven (27), Twenty-eight (28), and Twenty-nine (29) from said premises to the turnpike road leading to and over the bridge across the Shrewsbury River and called Ocean Avenue on said map, *said right of way or road being forty feet wide* through said lots Twenty-three to Twenty-nine both inclusive. Excepting, however, out of said premises the property of the New Jersey Southern Railway Company, being sixty feet in width throughout, and running through said premises as shown on said map. Also conveying hereby the strip of land being forty feet in width throughout and running through lot Number One (1) as shown on said map; said strip having been reserved by the party of the first part hereto in its conveyance of said Lot Number One (1) heretofore made to The Atlantic Highlands Association." (Italics supplied)

The purpose of this acquisition was to give the government access by land to its military reservation, and there is now a roadway opening from the reservation into the right of way. The gate to the reservation is ten feet wide, and neither now nor at any time has the roadway leading out of the reservation covered a width of more than approximately twenty-five feet.

The defendant's chain of title may be traced as follows: On November 1, 1887, the Highland Beach Association leased to the Highland Beach Improvement Company, hereinafter designated "Improvement Company", for a term of ten years from November 1, 1887 to November 1, 1897, lots 23, 24, 25, 26, 27, 28, 30, 31, 32 and 33, "excepting and reserving thereout the property of the New Jersey Southern Railway Company sixty feet wide and extending through said premises as shown on said map [map of 1880] and also excepting and reserving thereout a right of way forty feet wide and running through said premises as shown on said map with the appurtenances * * *."

The "Improvement Company" on November 1, 1887, sublet to the defendant, William Sandlass, portions of the above lots numbered 23 to 33 for a period of five years from March 1, 1888, to March 1, 1893.

On January 5, 1893, the "Improvement Company" sublet to the defendant, William Sandlass, for a term of five years from March 1, 1893, parts of lots "Nos. 23, 24, 25 and 26 * * * being substantially the same premises described in a certain lease [to the same party] * * * dated the Fourteenth day of June, 1892, and now occupied by the said parties for the operation of a gravity railroad". This property was described as lying between the eastern line of the present roadway and the right of way of the New Jersey Southern Railway.

On November 8, 1897, the Highland Beach Association leased directly to William Sandlass for a term of twenty-four years all the land lying north of the right of way of the Central Railroad Company (approximately north of lot No. 30) and south of the property owned by the United States. Among other exceptions, lands occupied by the Highlands and Seabright Turnpike Company were reserved.

On March 18, 1920, the Highland Beach Association granted William Sandlass title by its deed to the property lying between the northern line of the Central Railroad Company and the southern line of the United States (lots 23 to 29, inclusive), together wtih certain reversionary interests. The same exception contained in the lease of November 8, 1897, is noted.

At the outset this court is presented with jurisdictional objections. It is contended that a court of equity may not grant the extraordinary relief claimed where title is in issue, without first there being a determination of title in a court of law. Cases in New Jersey uphold this general proposition. But there does not exist herein that degree of dubiety as to the creation and extent of the right of way that would require a determination by a court of law. The problem depends entirely upon the construction of the instruments of title which would not lend itself to submission to a jury. Therefore, defendant's objection to a disposition of the case as being beyond the jurisdiction of this court must be overruled.

The crux of the defendant's case is based upon a construction of the language contained in the deed granting the right of way to the government, supra. The pertinent parts of the grant of right of way provide as follows: "together with a right of way over the road now laid out * * * said right of way or road being forty feet wide".

The defendant has established the fact that the physical use of the right of way to the extent of forty feet has never existed. Indeed, it was shown that prior to the government's deed of July 27, 1892, and during the term of one of the early leases set forth above, the defendant, William Sandlass, participated in the construction of a so-called switchback railroad which was located upon a portion of the right of way. This was replaced by the present structure which was erected soon after the

lease to William Sandlass of January 5, 1893. Others testified that the roadway prior to the time the government acquired title was of the same dimensions as the roadway today, and that the encroachment at that time was to the same extent as it is today. Portions of the alleged encroaching buildings occupy approximately twenty-four feet of the claimed right of way, reducing the roadway in some places to a passage way of sixteen feet.

It is the defendant's contention that the government received the roadway in its actual condition and not one forty feet wide. This is deduced from the proposition that monuments should control over courses and distances, etc., when there is a conflict between the two in the description of a deed. Fuller v. Carr et al., 33 N.J.L. 157; Andrews v. Rue, 34 N.J.L. 402. This contention is further supported by the proposition that the construction put upon an ambiguous deed by the parties may be resorted to in ascertaining their intention, Jackson v. Perrine, 35 N.J.L. 137. The latter rule of law is directed at the government's acquiescence in the boundaries from July, 1892, to July 11, 1936.

The above rules are inapplicable to the facts at bar. The ambiguity in the deed to the government is adequately clarified when it is read in connection with the map of 1880 filed by the Highland Beach Association with the Clerk of Monmouth County. This map was specifically referred to in the deed to the government as well as in the lease of November 1, 1887, to the defendant. The undisputed testimony shows that marble stones set in the early 1880's marked the western line of the right of way as being seventy feet from the center line of the sixty foot right of way of the railroad. The deed, the map and the testimony concerning the existing monuments conclusively demonstrate the creation of the right of way forty feet in width paralleling the sixty foot right of way of the railroad. We conclude that the phrase "now laid out" means as laid out on the map of 1880, and that a roadway forty feet wide was intended.

It is shown in defendant's brief that the Highland Beach Association some time after the map of 1880 was filed permitted the Highlands and Seabright Turnpike Company, an alter ego of the Association, to construct a turnpike over Ocean Avenue, and running north as far as lot 29, and that in 1903 the turnpike company relinquished

its rights therein to the Freeholders of Monmouth County by deed. In 1933 a new bridge was constructed over the Shrewsbury River which terminated at a point on lot 34 some distance south of lot 29. Upon the opening of this bridge the County of Monmouth by resolution relinquished all jurisdiction over and responsibility for the piece of roadway between lots 29 and 34, and vested such responsibility upon the Mayor and Council of the Borough of Seabright. As a result of this action the defendant, William Sandlass, claims that that part of lot 29 formerly used for the original bridge landing reverted to himself as the successor in title of the Highland Beach Association. He contends that even though the right of way of the government should be otherwise established, title to lot 29 rests in him unrestricted, and that the government's right of way, therefore, terminates in a dead-end at lot 29.

The action by the County of Monmouth in relinquishing responsibility over this piece of roadway was taken pursuant to Chapter 206 of the Laws of New Jersey of 1933, N.J.S.A. 27:16–28,[1] which provide for two contingencies, namely, the discon-

---

[1] "Any road or portion thereof owned by any county or under the control of any board of chosen freeholders may be (a) discontinued as a county road and returned to the jurisdiction and control of the municipality wherein the same is situated; or (b) vacated and abandoned as a public highway; in manner following:

"(a) Any road or portion thereof owned by any county or under the control of any board of chosen freeholders may be discontinued as a county road by a resolution passed by the affirmative vote of a majority of all of the members of the board of chosen freeholders, which resolution shall describe said road or portion thereof so sought to be discontinued as a county road sufficiently to clearly identify the same, and shall declare that the said road or portion of road therein described shall be discontinued as a county road, and that the county shall and does relinquish all jurisdiction over and responsibility for the construction, reconstruction, repair and maintenance thereof. The clerk of the board of chosen freeholders, upon the passage of such a resolution in manner aforesaid, shall prepare a certified copy thereof, and shall cause such certified copy to be served upon the clerk of the township committee, borough clerk or the clerk of any governing body of each municipality in which said road or portion thereof sought to be discontinued as a county road shall lie. Such certified copy shall be served as aforesaid within ten days from the date of the passage of such resolution. And at the expiration of the said period of ten days from the passage of such resolution the road or portion of road therein described shall cease to be a county road, and from thenceforward jurisdiction over the said road or portion of road shall vest in and the responsibility for the construction, reconstruction, repair and maintenance of said road, or portion of road, shall devolve upon the township committee, borough council or other governing body, as the case may be, of the municipality wherein said road or portion of road shall lie. The clerk of said board shall forthwith file a certified copy of said resolution in the office of the county clerk and the latter shall record and index the same in the road records of his office.

"(b) Any road or portion thereof owned by any county or under the control of any board of chosen freeholders may be vacated and abandoned as a public highway by any board of chosen freeholders, in manner following: The board of chosen freeholders of any county, by the affirmative vote of the majority of all the members thereof, may pass a resolution describing said road or portion thereof, intended to be vacated and abandoned, sufficiently to clearly identify and locate the same, and declaring it to be the intention of said board to vacate and abandon said road or portion thereof as a public highway, and fixing the time and place not less than three weeks or more than six weeks thereafter, when and where the said board shall meet for final consideration and action upon the resolution, and when and where all persons interested therein may appear and be given an opportunity to be heard. Within three days of the passage of said resolution, the clerk of the board of freeholders shall cause said resolution to be advertised verbatim in a newspaper published and circulating within the limits of said county, which publication shall be inserted once in each week for three weeks consecutively before the day of said meeting. And if, after the public hearing held at the time and place specified in said resolution, the board of chosen freeholders, by a vote of the majority of all of the members thereof, shall again adopt such resolution, the said road or portion thereof as described in the said resolution shall from thenceforth be deemed to be vacated and abandoned, and shall cease to be a public road or highway, and title to the land which theretofore was lying

tinuance of any road or portion thereof by any county or under the control of any Board of Chosen Freeholders as a county road, and vesting jurisdiction over and the responsibility for the construction, reconstruction, repair and maintenance thereof in the governing body of the municipality wherein the same shall lie, and secondly, the complete vacation and abandonment of such road, but not until interested parties have been notified of a hearing thereon. It appears from the defendant's brief that the action of the Board of Chosen Freeholders of the County of Monmouth by its resolution of September 6, 1933, was to discontinue the road in question as a county road under the first section of the above quoted act. There is nothing before us to indicate that there was a complete abandonment of the road upon notice as prescribed by the statute, and, hence, we must regard this portion of the road still as a public highway with responsibility for its maintenance and construction in the authorities of the Borough of Seabright. Under this view the rights of the United States to the use of the road are not adversely affected, nor does it appear that the defendant, William Sandlass, would have the power to shut off the use thereof by the United States.

Defendant's contention that he is a purchaser for value without notice of the creation of the government's easement, because the deed creating the easement is not in his chain of title, is likewise erroneous. The defendant and the government trace their title to common grantors. The map of 1880 was a public record, and if defendant had made a proper search of his title the right of way would have disclosed itself.

The defenses of laches, adverse possession and unclean hands are aimed at the government's dilatory assertion of its claim/to a forty foot roadway. It is conceded, however, that the government's rights cannot be foreclosed by its laches, or by adverse possession. Defendant, however, seeks to avoid the consequences of this concession by changing the label it appends to the government's inactivity. He says the same conduct constitutes "unclean hands" or renders applicable the maxim, "He who seeks equity must do equity". The argument is artificial. The government as conceded by defendant cannot be penalized for its inactivity, and that immunity remains intact.

The contention that the complainant has an adequate remedy at law has not been . pressed. The only claim in this connection was confined to the argument that title was in issue and should first be determined in a court of law. We have determined that this is unnecessary under the circumstances. Hence, we do not feel that the adequacy of legal remedies requires any further consideration.

The injunction sought for the removal of the encroachment is granted.

It is unnecessary to consider the counterclaim of defendant. No evidence being presented in support thereof, it is apparent that these contentions have been abandoned.

---

within the area of the side lines or legal right of way of said road, shall revert to and vest in the respective owners of the legal title thereto, free and clear of any easement or right of way thereover or thereupon in favor of the public. The clerk of said board shall forthwith file a certified copy of said resolution in the office of the county clerk and the latter shall record and index the same in the road records of his office."